UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 6, 2013
```

HOSPITAL AUTHORITY OF ROCKDALE
COUNTY,                                          :
                                                 :
                        Plaintiff                :
                                                 :     09 Civ. 8716 (PAC)
            - against -                          :
                                                 :     OPINION & ORDER
                                                 :
GS CAPITAL PARTNERS V FUND, L.P. ET AL., :
                                                 :
                        Defendant.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

This action arises out of a failed sale of Plaintiff's hospital due to Defendants' alleged breach of a financing commitment letter, executed in 2007. On October 15, 2009, Hospital Authority of Rockdale County ("Hospital Authority" or "Plaintiff"), instituted this action against GS Capital Partners V Fund, L.P., GS Capital Partners V Offshore Fund, L.P., GS Capital Partners V GmbH & Co. KG, and GS Partners V Institutional, L.P. (collectively, "GSCP" or "Defendants"), asserting that GSCP breached a commitment letter (the "Commitment Letter") to secure financing in the amount of $87.7 million, the entire purchase price of an asset purchase agreement for Plaintiff's sale of Rockdale Medical Center (the "RMC" or "Hospital") to Signature Hospital Holding, LLC ("Signature"), the buyer.

Hospital Authority claims that GSCP anticipatorily repudiated the Commitment Letter, shortly before closing, on a December 18, 2007 telephone call, during which GSCP told Hospital Authority that they would contribute no more than $35 million. (SAC ¶ 27.)[1] The deal with

---

[1] All SAC references are to the Second Amended Complaint, Dkt. 16.

Signature fell through, and Hospital Authority was forced to sell the Hospital to another entity for less money.  (Id. ¶ 39.)  Hospital Authority seeks to recover $29 million for the difference. (Id. ¶ 44.)

Hospital Authority brought two claims, one for breach of contract by anticipatory repudiation (Count 1) and a second for breach of the duty of good faith and fair dealing (Count 2).  GSCP moved to dismiss both claims; the Court denied the motion.  Hosp. Auth. v. GS Capital Ptnrs V Fund, L.P., 2011 U.S. Dist. LEXIS 5184 (S.D.N.Y. Jan. 20, 2011).  On February 28, 2011, GSCP answered the Complaint and added four counterclaims: two seeking declaratory relief with respect to the Commitment Letter, a breach of contract claim, and a claim for intentional misrepresentation.  On July 1, 2012, the parties cross moved for summary judgment.

For the reasons discussed below, the Court DENIES Defendants' motion for summary judgment with respect to Count 1 of Plaintiff's Second Amended Complaint, but GRANTS Defendants' motion with respect to Count 2.  In addition, the Court GRANTS Plaintiff summary judgment, dismissing Defendants' four counterclaims in their entirety.

**BACKGROUND**

Hospital Authority is a public hospital authority that owned the RMC, located in Rockdale County, Georgia.  It leased the Hospital to RMC which managed and operated the Hospital.  Signature is a healthcare company that focuses on the acquisition and management of rural hospitals.  (GSCP 56.1 ¶¶ 1-3.)  Defendants are private equity funds affiliated with the Goldman Sachs Group.  Some of Signature's directors are affiliated with Goldman Sachs.  (Id. ¶ 3.)

In 2005, the Hospital began suffering from difficulties associated with its expansion.  It failed to meet financial covenants, as well as failed to make necessary capital expenditures.

(SAC ¶ 11.)   In 2006, as the Hospital's financial health continued to decline, Plaintiff began to consider a possible sale of the Hospital.  (GSCP 56.1 ¶ 4.)  The Hospital Authority and RMC ("Sellers") formed a Joint Strategic Planning Committee ("JSPC") consisting of members of both boards who were responsible for overseeing the sale process.  (Id. ¶ 7.)

In early 2007, Sellers engaged in a process to identify potential purchasers.  (Id. ¶ 8.) Signature ultimately entered a non-binding final bid of $110 million.  (Id. ¶¶ 9, 10.)  By June 2007, Sellers negotiated exclusively with Signature.  The parties agreed to reduce the purchase price to $87.7 million.  (Id. ¶ 27.)

**A.  <u>The Commitment Letter</u>**

At Plaintiff's request, on August 27, 2007, GSCP entered into the Commitment Letter at issue in this case.  (Id. ¶¶ 19, 35; Declaration of Shahzeb Lari ("Lari Dec.") Ex. 64.)  It provided, in relevant part, that GSCP "shall provide, or shall cause the provision of, financing to Signature . . . for consideration of up to $87.7 million in the aggregate."  (Id. § 1.)  Such amount could be reduced "in the event that Signature does not require" all of the GSCP's promised financing. (Id.)  The commitment was conditioned on the execution of the Asset Purchase Agreement ("APA").  (Id. § 2.)  The Letter would terminate the earliest of (i) the termination of the APA, (ii) the closing of the transaction or (iii) January 31, 2008.  (Id. § 8.)

**B.  <u>The Deposit Agreement</u>**

On August 28, 2007, Signature and Hospital Authority entered into a Good Faith Deposit Agreement ("Deposit Agreement").  (GSCP 56.1 ¶ 34; Lari Dec. Ex. 62.)  Pursuant to this Agreement, Signature placed $1 million into escrow as liquidated damages if Signature chose not to close "for any reason."  (Lari Dec. Ex. 62, § 2.1(a)(v).)  The $1 million served as consideration for Hospital Authority's agreement to negotiate exclusively with Signature.  (Id. §

1.5.)  The agreement also provided that "such sum constitutes Sellers' sole remedy in respect of a breach or failure to close by Signature."  (Id. § 1.5.)  Defendants concede that they were not a party to the Deposit Agreement.

That same day, Hospital Authority and Signature executed a Letter of Intent containing a fully-negotiated Draft APA.  (GSCP 56.1 ¶¶ 32, 33.)  The APA remained unsigned, pending the Georgia Attorney General's review of the terms of agreement as required by the Georgia Hospital Acquisitions Act, O.C.G.A. § 37-7-400, et seq.  (Id. ¶¶ 31, 32.)  On September 28, 2007, Signature and the Sellers submitted the APA and supporting materials to the Georgia Attorney General for approval.  (Id. ¶ 36.)  The Georgia Attorney General held a public hearing on November 14, 2007 and approval was to be issued within 30 days, or on December 14, 2007.  (Id. ¶ 37; Lari Dec. 89.)

### C.  Complications Arise Over Financing

During financing negotiations in August 2007, Signature and Sellers discussed financing the transaction with approximately 65% debt financing from Merrill Lynch.  (GSCP 56.1 ¶ 28.)  After conducting due diligence at the Hospital for an appraisal, Merrill Lynch provided Defendants and Signature with a term sheet outlining the potential terms of its loan.  (Id. ¶¶ 39, 40.)  Unexpectedly, in early December 2007, Merrill Lynch altered the previously discussed terms.  (Id. ¶¶ 42, 43.)[2]  Signature and GSCP pursued other sources of debt financing and arrived at a preliminary agreement with CapitalSource Finance LLC ("CapSource") on or about December 9, 2007.  (Id. ¶¶ 45, 46.)

---

[2] The parties dispute the reasons for opposition to Merrill Lynch's altered terms.  Defendants claim that the terms were unacceptable to Signature because of significantly increased costs of acquisition, so that Signature made the decision not to go forward with Merrill Lynch's financing.  (GSCP 56.1 ¶ 42.)  Plaintiff asserts that GSCP was responsible for "firing" Merrill Lynch because Merrill Lynch insisted on pricing concessions that would have made the deal less favorable to Defendants.  (P. 56.1 Response ¶ 42.)

Shortly before the anticipated closing date and two days before the Georgia Attorney General's anticipated approval, on December 12, 2007, Signature informed Sellers that "[f]inancing discussions [had] been in flux over the last two days" and requested a meeting with Sellers for the next day.  (Id. ¶ 47.)  On December 13, Signature representatives Charles Miller and Mr. Hoffman met with Sellers' advisors, David Whelan and Penn Spell.   (Id. ¶ 49.) Defendants allege that at this meeting, Signature asked Sellers to consider a $20 million seller note.  (Id.)  Hospital Authority contends that it only agreed to consider the note after Signature reported that GSCP would not finance the full purchase price of $87.7 million.  (P. 56.1 Response ¶ 49.)  On December 14, Signature's counsel apprised the Georgia Attorney General that buyers and sellers were discussing incorporating a seller note into the payment structure. (Lari Dec. Ex. 88.)  The Georgia Attorney General delayed the approval and instructed the parties to report on their election to modify, terminate or proceed with the transaction by December 21, 2007.  (Lari Dec. Ex. 89.)

**D.  The December 18, 2007 Call and the Failure to Close**

On December 18, 2007, Sellers' advisors, Mr. Pope and Mr. Whelan had a telephone call with Defendants' representatives Matt Clare and Sean Fernandes.  (GSCP 56.1 ¶ 58.)  Plaintiff asserts that on this call, the GSCP's representatives acknowledged the Commitment Letter, but confirmed what Plaintiff had already learned from Signature on December 13, 2007, which was that "Goldman Sachs would not provide $87.7 million but would provide no more than $35 million in financing."  (P. 56.1 Response ¶ 58.)

At a December 20, 2007 JSPC meeting, the Sellers decided to continue to negotiate with Signature under a revised financing structure that included: (i) a $35 million equity contribution from Defendants; (ii) a $25 million seller note; and (iii) debt financing from CapSource.  (GSCP

5

56.1 ¶ 62.)  On December 21, 2007, the buyers and sellers jointly reported to the Georgia Attorney General that they intended to proceed with the transaction under the revised financing terms.  (Lari Dec. Ex. 101.)  GSCP continued to work with CapSource and Signature to finalize financing, resulting in the signing of a final term sheet on December 31, 2007. (Id. ¶ 65.)  On January 18, 2008, Signature and Sellers filed a third supplement with the Georgia Attorney General's office seeking formal approval of the transaction.  (Id. ¶ 67; Lari Dec. Ex. 119.)  The Georgia Attorney General held a second public hearing on February 12, 2008 to review the revised financing terms.  (Lari Dec. Ex. 93.)  On March 13, 2008, the Georgia Attorney General approved the sale of the Hospital.  (GSCP 56.1 ¶ 71.)

As the buyers and sellers worked on the closing, on March 17, 2008, CapSource announced that it could no longer fund the transaction because credit markets had dried up in response to JPMorgan Chase's acquisition of Bear Stearns.  (Id. ¶¶ 72, 73.)  GSCP and Signature spent the next two months attempting to find alternate financing to no avail.  On May 27, 2008, Signature withdrew as purchaser and the transaction ultimately failed to close.  (Id. ¶ 78.)  Hospital Authority retained $1 million in liquidated damages from Signature.  In February 2009, after another auction and further Attorney General review, the Hospital Authority sold its hospital to Historic LifePoint Hospitals, Inc. for $80 million.  (Id. ¶ 80.)

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim demonstrating that it is entitled to

6

relief.   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a genuine dispute as to those facts."   Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted).

**I.   DEFENDANTS' SUMMARY JUDGMENT MOTION**

**A.   Anticipatory Repudiation**

a.   Defendants' Anticipatory Repudiation of the Commitment Letter

Under New York's anticipatory breach doctrine, the non-repudiating party is entitled to damages for total breach when the breaching party repudiates contractual duties prior to the time designated for performance.   Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463 (N.Y. 1998).   "A repudiation can be either 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would . . . give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'"   Id.

> i.   Whether Defendants indicated that they would not fund more than $35 million of the purchase price raises a genuine issue of material fact.

Whether repudiation occurred is usually "a factual determination and heavily dependent upon a determination of whether a breaching party's words or deeds are unequivocal."   Fonda v. First Pioneer Farm Credit, 927 N.Y.S.2d 417, 419 (N.Y. App. Div. 3d Dep't 2001).

Plaintiff contends that on the December 18, 2007 call, GSCP's representatives unequivocally stated that they would not finance the full $87.7 million.   Drawing all factual inferences in its favor, Plaintiff has provided sufficient evidence to support a theory of repudiation.   David Whelan testified that on the call, GSCP's representatives stated that they

7

would provide only $35 million in equity. (Declaration of Tiana S. Mykeltvedt ("Mykkeltvedt Dec.") Ex. 10, Whelan Dep. Dated 11/15/2011 at 108:18 – 109:9.) This is corroborated by his notes summarizing the call to other Sellers' advisors, in which he stated "[t]hey had no good explanation why they were not honoring their commitment letter." (Lari Dec. 97, 12/18/2007 Email from D. Whelan to D. Whelan et al.)[3] One could reasonably interpret GSCP's statement to suggest that GSCP would not fund the balance of the purchase price beyond $35 million, through equity financing or otherwise. As of the time of the call, no third-party debt financing was in place, which Plaintiff contends is a consequence of GSCP's decision to "fire" Merrill Lynch because they requested pricing concessions that would have disfavored GSCP.[4] Matt Clare, a GSCP representative on the call, testified that between December 10 and December 18, Defendants understood that they would not contribute more than $35 million, and there was never any discussion about whether Defendants would provide for debt financing and on what terms. (Mykeltvedt Dec. Ex. 2; Clare Dep. Dated Oct. 21, 2011 74:22 – 75:9.) Further, Plaintiff argues that it was GSCP, not Signature, that had insisted on increasing the seller note from $20 million to $25 million (P. 56.1 Response ¶ 57; Mykkeltvedt Dec. Ex. 53, 12/18/2007 Email from

---

[3] See also supra, at n.2. Also probative are the Sellers' minutes from a meeting of the JSCP on December 15, 2007, which report that their topic of discussion centered on "the failure of Goldman Sachs to honor its commitment to fund the entire transaction and now only to fund $35 million in equity with no good explanation." (Lari Dec. Ex. 90, Page 1 of 3.) A set of notes from the same meeting recount that "Goldman Sachs will put in $35M and that's it" and reflect the Sellers' understanding of the matter: "we view GSCP's actions of $35M as a repudiation of the hard commitment." (Lari Dec. Ex. 91, Page 2 of 4.) Although the December 15, 2007 meeting occurred before the alleged repudiation on December 18, 2007, Plaintiff argues that they first learned of GSCP's unwillingness to fund the entire transaction from Signature on December 13, 2007. Signature's representations are not actionable as an anticipatory repudiation by GSPC, but are nonetheless probative of GSCP's intent to breach the Letter and support the conclusion that GSCP would later anticipatorily repudiate by their own statements.

[4] Plaintiff's allegations find some support in the testimony of Goldman representatives discussing the "firing," (Mykkeltvedt Dec. Ex. 2; 10/21/2011 Clare Dep. 63:16-25), and communications among Sellers' representatives stating that "Goldman was upset that Merrill was supposed to be underwriting the deal but kept upping the pricing." (Lari Dec. Ex. 76, 12/17/2007 Email from Bryan Pope to David Whelan).

C. Miller to Bob Lefton), and that GSCP had been behind Signature's request for seller financing in the first place (P. 56.1 Response ¶¶ 47, 49).[5]  Under these circumstances, a reasonable trier of fact can interpret GSCP's statement as an unequivocal expression of its intention not to secure the entire purchase price.

> ii.  Whether GSCP conditioned its $35 million commitment on seller financing raises a genuine issue of material fact.

In New York, anticipatory breach occurs when a party "attempt[s] to avoid its obligations by advancing an untenable interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extra-contractual conditions."  SPI Commc'n v. WTZA-TV Assocs. Ltd, P'ship, 644 N.Y.S.2d. 788, 790 (N.Y. App. Div. 3d Dep't 1996).  Here, there is no doubt that the demand for a $25 million seller note to fund an $87 million transaction is a material, substantial condition.  The Letter does not provide for any seller financing as a condition to performance.  (Lari Dec. Ex. 64.)  If GSCP conditioned its offer, then GSCP may have anticipatorily breached the Letter.

Plaintiff claims that "Goldman Sachs announced that it would not provide or cause the provision of *any* financing unless [Hospital Authority] itself put in $25 million of the purchase price."  (P. Opp. at 12-13.)  Plaintiff has presented sufficient proof of its claim to survive summary judgment.  In a chain of internal Signature emails, Mr. Miller related that on December 17, 2007, Adrian Jones of Goldman Sachs told Mr. Miller that "they were not going to fund the equity piece of the transaction.  He said . . . it was not up for discussion. . . .  Within 30 minutes, Sean Fernandes [of GSCP] called and said . . . . if we could get the Seller to agree to a $25

---

[5] Signature approached Sellers, but Signature's understanding was that Signature could not make any proposals to Seller without GSCP's approval.  (Mykkeltvedt Dec. Ex. 59, 12/12/2007 Email from C. Miller to S. Peterson et al.).  This is consistent with Mr. Jones' admonishment that Signature was "not free to negotiate a deal on our behalf." (Mykkeltvedt Dec. Ex. 22, 12/14/2007 Email from A. Jones to S. Fernandes et al.).

million note . . . [Mr. Jones] would approve the deal." (P. 56.1 Response ¶ 57; Mykeltvedt Dec. Ex. 53, 12/17/2007 Email from C. Miller to B. Lefton.) Further, David Whelan testified that as of December 18, 2007, GSCP was "willing to invest . . . $35 million, as long as the seller took back financing for $25 million, and there was additional financing to bridge the gap." (Mykeltvedt Dec. Ex. 10; Whelan Dep. Dated 11/15/2011 at 102:18-24.) Defendants vigorously argue that GSCP's equity was committed, raising credibility issues and citing, for example Mr. Whelan's same-day notes summarizing the call and a partial transcript of a telephone meeting among Sellers' representatives discussing the December 18 call, neither of which referred to seller financing as a condition. (Lari Dec. Ex. 97; Ex. 100.) The Court declines to make credibility determinations at summary judgment. Whelan's deposition testimony and Signature's corroborating emails are sufficient to create a genuine factual dispute. Defendants also contend that since Sellers considered seller financing prior to the date of the alleged breach, it did not make sense for Defendants impose a condition to which Plaintiff already agreed. Whether Sellers previously agreed to seller financing on the same terms, again is a factual issue, which makes summary judgment inappropriate.

### iii.  Plaintiff has Identified Sufficient Facts to Establish Damages

"Causation is an essential element of damages in a breach of contract action . . . .  [A] plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original). Damages must be "directly traceable to the breach" and not the "result of other intervening causes." Id. at 526. Since Plaintiff is seeking the lost value of the Signature transaction as originally structured, it must show that Signature would have closed under the original APA, if GSCP provided or caused to be provided the entire purchase price.

10

Whether Signature would have closed but-for the alleged breach is a genuine issue of material fact.  Mr. Hoffman of Signature testified that as of December 10, 2007, Signature was ready and willing to close, if the financing was in place.  (Mykkeltvedt Dec. Ex. 4, 10/13/2011 Hoffman Dep. at 48:17-49:3).  Signature informed the Georgia Attorney General by letter that it "intend[ed] to proceed with the transaction as initially submitted."  (Mykkeltvedt Dec. Ex. 14, 12/10/2007 Letter from A. Burks to R. Lerer.)  Defendants respond that Signature chose to abandon the transaction for reasons not related to the failure to provide the full $87.7 million.  (GSCP 56.1 ¶ 77.)  Specifically, as Signature's other hospitals experienced revenue declines, in April 2008, Signature's management decided to refocus its efforts on "retrenchment rather than expansion."  (D. S.J. Br. at 8.)  This decision is not dispositive of whether Signature would have purchased the Hospital in December 2007, when the parties anticipated the Georgia Attorney General's approval, had Defendants made financing available.  (Lari Dec. Ex. 144, 5/22/2008 Email from R. Starling to A. Jones et al., Attachment at Page 4.)  Further, Signature discussed ways to revive the Rockdale transaction as late as spring 2008.  (Mykkeltvedt Dec. Ex. 43, 6/2/2008 Email from C. Miller to M. Clare and S. Fernandes.)

> b.  <u>Plaintiff's Waiver of Any Repudiation That May Have Occurred</u>

The law of election-of-remedies in anticipatory repudiation cases is well-settled:

> "When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options.  He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.  The non-repudiating party must, however, make an affirmative election.  [It] cannot at the same time treat the contract as broken and subsisting, for one course of action excludes the other.  Indeed, the law simply does not permit a party to exercise two alternative or inconsistent . . . remedies."

Lucente v. IBM, 310 F.3d 243, 258-59 (2d Cir. 2002) (internal quotations and citations omitted). In determining whether a party has made an election, the "operative factor . . . is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election." Id. at 159.

A reasonable trier of fact can conclude that Plaintiff did not elect to continue under the Commitment Letter but under a different agreement after the purported breach. Indeed, Hospital Authority's conduct suggests that it regarded the Commitment Letter as terminated. Mr. Whelan expressly accused GSCP of breaching the Commitment Letter on the December 18, 2007. (Mykkeltvedt Dec. Ex. 10, Whelan Dep. Dated 11/15/2011 at 108:18 – 109:9). After that point, Plaintiff made no attempt to pursue GSCP for the full purchase price. Further, the financing changes to the transaction were sufficiently material as to cast doubt on whether Plaintiff was electing to proceed pursuant to the August 27, 2007 Commitment Letter.[6]   The Letter was

---

[6] The Court rejects Defendants' argument that Plaintiff is judicially estopped from making this argument. Defendants argue that in Plaintiff's submissions to the Georgia Attorney General, Plaintiff described the financing change as a mere "modification" to the transaction and should not now be permitted to characterize the revised transaction as "new." (D. S.J. Br. at 15-16, Lari Dec. Exs. 7, 101, 119.)   "A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (citations and internal quotation omitted).   This doctrine is inapplicable here because Plaintiff's description of the financing change was a characterization.   There is no evidence that the Georgia Attorney General relied on it in the face of Plaintiff's disclosure of the terms of the proposed financing changes, including the seller note and the fact that buyers would not be paying an all-cash purchase price. (Lari Dec. Ex. 120, Draft APA Dated 1/17/2008, § 3.2; Ex. 119, Third Supplemental Notice § II.6.)   Plaintiff is not now making a factually inconsistent statement.   Mitchell, 190 F.3d at 6 (finding that judicial estoppel precludes parties from making "directly conflicting statements about purely factual matters"); see Simon v. Satellite Glass Corp., 128 F.3d 68, 73 (2d Cir. 1997) ("If the statements can be reconciled there is no occasion to apply estoppel.").   In addition, Plaintiff's submission included the JSPC's December 15, 2007 meeting minutes disclosing Plaintiff's view that GSCP had repudiated the Letter. (Lari Dec. Ex. 119 (listing Exhibit Z-1 "Seller Board Minutes"; Mykkeltvedt Dec. Ex. 61 at HARC00009623).

12

negotiated specifically to exclude any financing contingency and required GSCP to make available the entire purchase price, which is incompatible with a $25 million seller note.

Defendants argue that Plaintiff continued accepting GSCP's performance pursuant to the Letter by proceeding with the sale on terms that included Defendants' offer of $35 million in equity and CapSource's debt financing, which Defendants had arranged.  (GSCP 56.1 ¶¶ 61, 62.) "A party can indicate that he has chosen to continue the contract by . . . accepting the performance of the breaching party."  Bigda, 898 F. Supp. at 1013.  Arguably, however, GSCP was performing pursuant to the terms of the parties' new agreement, not the Commitment Letter. Further, if the GSCP imposed seller financing as an extra-contractual condition, its offer of $35 million would not have constituted a "benefit" of or performance pursuant to the terms of the Commitment Letter.

**B.  Breach of the Duty of Good Faith and Fair Dealing**

Count 2 of Plaintiff's Second Amended Complaint alleges that GSCP violated the covenant of good faith and fair dealing.  As a general rule, a breach of the covenant-of-good-faith claim is duplicative of a breach-of-contract claim such that raising both is redundant.  See Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).  "[E]very court confronted with such a [duplicative] complaint brought under New York law has dismissed the claim for breach of the covenant of fair dealing."  W.S.A., Inc. v. ACA Corp., 1996 U.S. Dist. LEXIS 14198, at *30 (S.D.N.Y. 1996).  To simultaneously plead both, "a plaintiff [must]. . . base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims . . . ."  JPMorgan Chase Bank, N.A., 2009 U.S. Dist. LEXIS 9207, at *16.  Here, Plaintiff's allegations fail to raise a distinct factual predicate for the breach of covenant claim,

and it is therefore duplicative of express breach of contract claim.  Accordingly, the Court grants Defendants' summary judgment motion to dismiss Count 2.

## II. PLAINTIFF'S SUMMARY JUDGMENT MOTION AGAINST DEFENDANTS' COUNTERCLAIMS

### A. Declaratory Judgment that the Commitment Letter Expired, and that Hospital Authority is Estopped from Alleging Breach (Counts 1 and 2)

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), vests a district court with discretion to exercise jurisdiction over a declaratory action.  In deciding whether to grant declaratory relief, the Second Circuit has instructed district courts to ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411, F.3d 384, 389 (2d Cir. 2005).  With respect to the first factor, declaratory proceedings serve no "useful purpose" when the relief sought "can already be had via a trial on the merits."  CAMOFI Master LDC v. College P'ship, 452 F. Supp. 462, 480 (S.D.N.Y. 2006).  Declaratory judgment actions will be dismissed where they duplicate relief because they "will, of necessity, be resolved in the course of the litigation of the other causes of action."  Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249-50 (S.D.N.Y. 2006).

In this case, Defendants seek a declaratory judgment that "the Commitment Letter, and any of Defendants' obligations thereunder, expired on January 31, 2008."  (Answer ¶ 72.) Declaratory relief, however, would not serve a "useful purpose."  Plaintiff has never maintained that the breach occurred after January 2008, nor has it ever attempted to expand the scope of its claims past January 31, 2008.  The issue is whether Defendants repudiated the Letter in December 2007.  Defendants' declaratory claim will be fully resolved in the context of Plaintiff's breach-of-contract claim and is therefore unnecessary.  Further, a declaratory order

14

would not offer relief from uncertainty.  There is no dispute that the Commitment Letter has by now, expired, either by its own terms or due to Defendants' repudiation.

In addition, Defendants request a declaration that "Hospital Authority is now estopped from claiming that Defendants breached or repudiated their obligations under the Commitment Letter" because, at all relevant times, Hospital Authority treated the Commitment Letter as if it were in effect and never informed Defendants that they believed the Letter had been repudiated. (Count 2, Answer ¶ 75.)  The factual predicate for Defendants' claim raises genuine issues of fact that will be resolved at trial in the context of Plaintiff's repudiation claim.

Declaratory relief is inappropriate on both counts.  Plaintiff's motion for summary judgment to dismiss these claims is granted.

## B.  Breach of the Deposit Agreement (Count 3)

The Court has previously considered and dismissed Defendants' argument that the Deposit Agreement entered into between Signature and Hospital Authority "foreclosed [Hospital Authority] from pursuing any claims against Defendants . . . ."  (Answer ¶ 80.)  (Order at 7, Hosp. Auth. V. GS Capital Ptnrs V Fund, L.P., 09-Civ.-8716 (PAC), 2011 U.S. Dist. LEXIS 5184, at *11 (S.D.N.Y. 2011).)  Nonetheless, Defendants raise it again "in light of the facts established during discovery, which have shown that all the parties to the transaction—the Sellers, Signature and Defendants—perceived the Deposit Agreement as part of an integrated transaction."  (D. Opp. at 19.)  Discovery cannot change the prior determinations that Defendants have no standing to enforce the Deposit Agreement.   Defendants were not the intended beneficiaries of the Deposit Agreement.   Accordingly, the Court grants Plaintiff summary judgment on Count 3.

C.  **Intentional Misrepresentation (Count 4)**

Defendants allege that Hospital Authority made material misrepresentations and omissions in asserting that GSCP had breached the commitment letter, which caused commercial harm and the loss of reputation.  (Answer ¶ 83.)  This claim appears to be based more on desperation than sound legal analysis.

Under New York law, an intentional misrepresentation claim is equivalent to a fraud claim.  Lehman v. Garfinkle, 2009 U.S. Dist. LEXIS 84686, at *27 (S.D.N.Y. 2009) (citing Chen v. U.S., 854 F.2d 622, 628 (2d Cir. 1988).  To prevail, the complainant must show, by clear and convincing evidence, "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff."  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1999).

This claim has no merit.  If Defendants in fact anticipatorily repudiated the Commitment Letter, they did so by stating unequivocally that GSCP would not perform.  If on the other hand, there was no repudiation, then GSCP's efforts were carried out in performance of the Commitment Letter, in which case Defendants have failed to allege damages.

In addition, Defendants have failed to provide any factual basis for the damages alleged. First, with regard to reputational harm, Mr. Jones testified that he was unaware of "any . . . banks that . . . refused any kind of business dealings with the defendant funds as a result of [Plaintiff's] intentional misrepresentations and omissions" (Mykkeltvedt Dec. II Ex. 6, Jones Dep. 40:7-12) or "any investor [that has] given notice or complaint about the misrepresentations or omissions" (id. 45:1-5).  As for costs and expenses, Defendants have not presented evidence that the funds were charged for or paid for any of the time of its employees.  Finally, with respect to GSCP's

16

allegations of lost business opportunities, lost profits "may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach." Travellers Int'l, A.G. v. Trans. World Airlines, 41 F.3d 1570, 1578 (2d Cir. 1994). The only other hospital that Defendants' Rule 30(b)(6) representative, Mr. Jones, identified for possible acquisition was Trumbull. (Mykkeltvedt Dec. II Ex. 6, Jones Dep. at 25:12-13.) But the record is devoid of any basis for concluding that Signature would have purchased or GSCP would have financed the acquisition of Trumbull but-for their investment of resources in the Rockdale transaction. Given Defendants' failure to adequately prove damages, the Court need not address whether Plaintiff made material misrepresentations or omissions to grant summary judgment on Defendants' counterclaim.

## CONCLUSION

For the reasons stated, GSCP's motion for summary judgment is DENIED with respect to Count 1 and GRANTED with respect to Count 2. Hospital Authority's motion is GRANTED in its entirety. The Clerk of Court is directed to close the motions at docket numbers 60 and 63.

Dated: New York, New York

March 6, 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge